The substantial issue raised by the pleadings was, whether the relator had not, by continuing to act under the old board, after the passage of the Metropolitan Police act, and omitting to take a new oath of office, forfeited any claim to be considered a patrolman of the new district. The new district was an extension of the old one, and comprehended the counties of Kings, Richmond and Westchester, as well as the city and county of New York. It changed the names of the various officers composing the active and efficient force; but, as was said by Judge DENIO, in the case of The People v. Draper (15 N.Y., 532), "the superintendent of police, captains, sergeants and patrolmen mentioned in the Metropolitan Police bill are officials of the same character, possessing substantially the same powers and authorized to *Page 197 
perform the same functions as those heretofore existing, under somewhat different names." The 6th section provides that the offices created for the police force shall be severally filled by appointment from the board of police in the mode prescribed by that act; but that must have reference to such as are newly introduced into the force, as the latter part of the 32d section, having reference to the same subject, is in the following words: "The police force in the cities of New York and Brooklyn, officers and patrolmen, shall continue to do duty under existing laws, at the passage of this act, and according to regulations of the department of New York and Brooklyn, until the first meeting of the board of police under this act, when the said police shallhold office and do duty under the provisions of the act hereby enacted; and as members of `the Metropolitan Police District' hereby constituted." The "patrolmen" mentioned in this provision are evidently the policemen appointed under the act of 1853, as there could be no more patrolmen until after the first meeting of the new board, and the direction was as to their conduct previous to said meeting.
Besides, the expression that they should continue to do duty until the meeting, under previously existing laws, when they should hold office and do duty under the new act as members of the Metropolitan Police District thereby constituted, clearly refer to and include the policemen who were in office when the new act was passed. The defendants contend that this was a new and legislative appointment of officers. The Legislature has frequently appointed officers newly created, and probably has the power to do so when not restrained by the Constitution. But this does not purport to be a new appointment, but is in terms a mere continuance in office. The officers designated were to continue to do the same duties as before, and to hold in effect the same office, but under a different title. The policemen under the old law and the policemen under the new one were, as was truly said by Judge DENIO, officials of the same character, possessed of the same powers, and authorized to perform the same functions. Those were the most important particulars connected *Page 198 
with the office, and, in conjunction with the unequivocal declarations in the statute, are sufficient to indicate its continued identity. Nor was that identity destroyed by the changes in the rules of procedure or the extension of the district. The alterations as to the manner in which the duties were to be discharged were principally formal, and were no greater than such as are frequently adopted when there is no pretence of a change of office. The enlargement of the district merely extended their sphere of action. The patrolmen were not to be appointed indiscriminately from the entire district, but quotas were to be selected from the different localities; as many from the county of New York as might be determined upon by its board of supervisors; as many from the city of Brooklyn as should be determined upon by its common council; as many from the towns in the county of Kings as might be determined by the supervisors of such towns, and as many from each of the counties of Richmond and Westchester as might be determined by the supervisors of those counties respectively. And until otherwise provided for, the quota of patrol force for the county of New York and for the county of Kings should be of the number of patrolmen then existing by law in the cities of New York and Brooklyn; and each of the localities thus specified in the act was to pay for its own policemen. (§ 6.)
Thus, then, the supervisors (except in Brooklyn the service was to be performed by the common council) were to determine the number to be appointed in their respective counties, and they were to be selected from and paid by their own counties. It seems to me that, in consequence of these provisions, *Page 199 
each county preserved its individuality as to those officers. They may not have been county officers as to their mode of appointment, as was decided by this court in the case of ThePeople v. Draper, and as to the extent of territory in which their services were to be performed; but they were such in all other important particulars; and, therefore, the Legislature were consistent in providing that the occupants of the old offices should continue to hold them under a new designation.
If, then, the relator was entitled to hold the office of patrolman when the act of April 15, 1857, went into operation, no personal acceptance by him was necessary. The act itself continued the official tenure. It has never been held, nor could it be with any reason, that a mere change of the name of office, or of its duties as long as they remain substantially the same, so far ousted the occupant from office as to require his direct assent to his restoration. He would retain the office (while living) until the expiration of the term, if there should be any, or his removal from it, or his resignation and possibly its acceptance.
It was contended, however, that the relator, by his conduct, vacated the office. The Revised Statutes declare in what cases an office shall become vacant. (1 R.S., 122, § 34.) They provide that every office shall become vacant on the happening of either of the following events: (1) the death of the incumbent; (2) his resignation; (3) his removal from office; (4) his ceasing to be an inhabitant of the State, or, if the office be local, of the district, county, town or city for which he shall have been chosen or appointed, or within which the duties of his office are required to be discharged; (5) his conviction of an infamous crime, or of any offence involving a violation of his oath of office; (6) his refusal or neglect to take the oath of office within the time required by law, or to give or renew any bond within the time prescribed by law; or (7) the decision of a competent tribunal declaring void his election or appointment. The only charges brought against the relator which could, if true, bring his case within this category, are, *Page 200 
first, that he neglected to take the oath of office within the time required by law; and, second, that he, in effect, resigned the office.
It is to be inferred, although I do not see it distinctly stated in the special verdict, nor was it mentioned in the charges preferred against the relator before the police board, that he has never taken the oath of office under the Metropolitan Police act. If I am right in supposing that the act continued him in his old office, no new oath of office was necessary, unless it was positively required by the statute. The 30th section provides that the board of police shall make suitable provisions for the taking, by members of the police force, of an oath of office, and the registry of the same in a book to be kept for that purpose. It does not appear very clearly whether this provision has reference to all the members, or only to those who might be newly appointed. The reasonable inference would seem to be, that it included only those who had not previously taken the oath of office. But if it referred to all they were not required by law to take the oath until the police board had made suitable provisions on the subject, and had furnished a book in which it was to be registered; and it does not appear, nor is it alleged in the return by the defendants to the alternative mandamus, that the board had performed either of those services. There was not, therefore, any neglect or refusal of the relator to take an oath of office.
The defendants do not directly allege that the relator resigned his office, but they say that he refused to take or hold office under the new act, or under the board of police thereby established, which they probably deemed equivalent to a resignation. The 12th section of this act provides that no member of the police force, under penalty of forfeiting the pay which may be due to him, shall withdraw or resign from the police force, unless he shall have given one month's notice thereof in writing to the General Superintendent of Police. This would seem to provide the manner in which, and in which only, a resignation can be made; and there is no pretence that the relator thus resigned. It was contended, however, that *Page 201 
the relator had, by his conduct, abdicated the office, which was, in effect, a resignation; and the case of King James II. of England was cited to show that the abdication created a vacancy. But that unfortunate and misguided monarch had abandoned the country, and ceased to perform any of his royal functions; and yet it was doubted by many eminent men of the time whether he had actually vacated the kingly office, and it was supposed that the Parliament, in resolving that he had, acted rather from a great state necessity than from any well-settled principle. In the case under consideration, however, the relator did not abandon his district, nor did he cease to perform the actual duties of his station. Indeed, it would seem, from the special verdict, that, for a long period after the passage of the new act, he could not have performed any police duty in his (the 14th) district in any other manner.
The special verdict states "that the members of the old force including the relator, under the command of Captain Kissner, did the police duty of the fourteenth ward, up to the last of June or first of July, 1857, and were the only police force on duty in the fourteenth ward." It was not in the power of the relator to reorganize the district, and the omission to place it in a proper condition for the performance of any duties under the new act was attributable to the higher powers, and not to him. The only charge which was intended to be brought against him before the Board was, that he had neglected to obey an order to report for duty at 88 White street, on the 18th day of June, at 8 o'clock, P.M. If he had been named in the charge, and it had been proved against him on a trial of which he had been duly notified, and he had omitted to make any defence, such disobedience might have been a sufficient cause for dismissal. But, as has been already indicated, the irregularity of the proceeding deprived it of all effect. It was not even in proof that the charge was well-founded. Besides, according to the decision in the case ofVan Orsdall v. Hazard (3 Hill, 243), a refusal to serve, although without sufficient reason, is not, per se, a forfeiture of an office. The judge who delivered the opinion of the court in that case, *Page 202 
quoted the decisions in Lyon v. The Commonwealth (3 Bibb,
430), and Rex v. Exeter (Comb., 197), that if an officer should remove beyond the district to which his office related, for the purpose of temporary occupation, and that even for months, if he had done so with an intention to return and continue his former domicil, that would not of itself vacate his office. If, therefore, the case had shown, more clearly than it does, that the relator had neglected or refused to perform some official duty, that would not have established the charge that he had vacated his office.
The principal charge against the relator, and that issue has probably caused the entire controversy between him and the defendants, is, that under the advice of the late mayor of the city of New York and the captain of his district, he did not recognize the Metropolitan Police law, and, in association with a body of several hundred men, who belonged to the police of the city of New York, under the act of April 15, 1853, refused to act under the new law, but continued to obey all general orders that had issued from the old board. This the defendants seemed to consider as "flat rebellion;" and their counsel compared the conduct of the relator with that of the traitor Arnold, of revolutionary notoriety. But there seems to be a wide difference in the character of the two transactions. Arnold rebelled and fought against his country, which had appointed him to a high and confidential office. The relator did not rebel against or dispute the power of the people, whose officer he was; but he denied the authority of persons alleging themselves to be the people's agents. His conduct resembled that of the boy who, having found a valuable diamond, refused to give it up to the person demanding it, on the ground that he did not know that said applicant was the true owner. It was held that said refusal was, under the circumstances, reasonable, and did not amount to a conversion, although it turned out that the person making the demand was the actual owner. There is no pretence that the relator acted willfully wrong. He was advised by the board from which he had originally received his appointment, and by the captain of his district under whose *Page 203 
immediate orders he had been placed, that the statute purporting to establish the new board was unconstitutional and void. He, no doubt, ascertained that the same opinion had been expressed by learned lawyers. The question involved was a doubtful one, as was subsequently shown by the diversity of opinion among eminent judges. Between the old board and the new one, the policemen were subjected to a serious dilemma. If they acknowledged the authority of the old board, and it should turn out that the act of 1857 was constitutional, they were in imminent peril of losing their position; and if they acknowledged the authority of the new board, and the act constituting it should be adjudged unconstitutional, they would encounter the same peril. Under such circumstances, it would seem to be a hard rule to hold them responsible for a simple error in judgment. It might be that public necessity might require prompt action by the new board against the recusants; and, in that case, they could apply the remedy by trials and removals. But, if they neglected to organize a district under the new law, and thereby reduced the policemen to the necessity, either of living idle or of acting under the old act, and those officers chose to act under the old law, pursuant to the advice of their superior officers, and from an honest belief that such advice was correct, until a final decision of the question as to which of the two boards they owed obedience, and, when that decision was pronounced, promptly offered to submit to the recognized board; it seems to me that, although their conduct was not strictly justifiable, yet it was excusable, and that it could not imperatively call for their ejection from office. Certainly, it could not amount to a forfeiture without a trial.
It appears, from the special verdict, that the relator performed actual duty as a policeman, or a patrolman, until the 3d day of July, 1857, and that he then promptly tendered his services as a patrolman to the new board, which were declined. He received his pay up to the 26th of June, but has received none since. He is, I think, fairly entitled to a restoration to *Page 204 
the office from which he has been irregularly ejected, and to the emoluments appertaining to said office.
The judgment awarding the mandamus must be affirmed
SELDEN, J., was in favor of affirmance; JOHNSON, Ch. J., DENIO and GROVER, Js., dissented: the former delivered their opinion: